## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## OCALA DIVISION

**UNITED STATES OF AMERICA**

**VS.**                                             **CASE NO: 5:13-cr-45-ACC-PRL**

**MARK JAMES WILLIAMS**

_____

### ORDER

This cause comes before the Court on Defendant Mark James Williams'

Motion for Compassionate Release (Doc. 104) pursuant to 18 U.S.C. §

3582(c)(1)(A), the Government's Response (Doc. 106), the Government's

Supplemental Response (Doc. 108) and Defendant's Reply (Doc. 109). The matter

is ripe for review. For the reasons discussed below, the Motion will be denied.

### I.    PROCEDURAL BACKGROUND

Defendant Williams is 74 years old and has been diagnosed with Prostate

Cancer, Stage IV. Following a guilty plea in the Middle District of Florida to one

count of possession of child pornography, the Court sentenced him to serve 120

months consecutive to the 120-month sentence he was already serving that was

imposed in 2009 by the Southern District of Florida for drug smuggling and for

failing to register as a sex offender. (Doc. 104 at 4 n.6). As of October 20, 2021,

Defendant had completed his sentence of 120 months for the Southern District case

and has served an additional 36 months of the current sentence in the Middle District

case (or 30% of ten years), as calculated by the Bureau of Prisons.[1] (Docs. 104-3 at 3; 104-4 at 5-7 (12 years, 9 months as of Jan. 12, 2022). He is currently incarcerated at the Federal Medical Center in Butner, North Carolina. (Doc. 104-3 at 2-3).[2]

Defendant Williams has a lengthy criminal history of convictions that dates back to 1976 for possession of marijuana (age 28); possession of cocaine in 1982 (age 34); and possession/distribution of a controlled substance (diazepam) in 1983 (age 35), all charged in state court in Oklahoma City. (Presentence Report ("PSR") ¶¶ 32-34, 44). His first two sentences were deferred, and when he pleaded guilty to distribution in 1984, he was sentenced to five years in prison, but released after 19 months on a sentence modification. (*Id.*). In Alaska state court, Defendant was charged with misconduct involving a controlled substance (crack cocaine) after he was arrested for soliciting an undercover officer posing as a prostitute in March 1998 (age 50); he received a sentence of 18 months, suspended. (*Id.* ¶ 35).

On October 19, 2000, Defendant Williams was convicted of Possession of Child Pornography and the Manufacture of Marijuana, in United States District Court for the District of Alaska, when agents found 57 marijuana plants in a "grow house" and 1,000 images of child pornography in his home; he was sentenced to 30 months imprisonment and three years of supervised release, and the charges of

---

[1] The BOP calculated the separate sentences in the aggregate, combining the time served for the two sentences as 12 years and 9 months and a projected release date of April 6, 2026. (Doc. 104-4 at 7 (as of Jan.12, 2022)).

[2] *See also* http://www.bop.gov/inmateloc for Reg. No. 14062-006.

Distribution of Child Pornography were dismissed by the Government at sentencing. (*Id.* ¶¶ 7, 36; 2009 PSR ¶ 27).[3]

On March 23, 2009, Defendant was arrested and charged with importing cocaine in the Southern District of Florida after taking several cruises and flights to Costa Rica, including one in March 2009 during which he picked up and attempted to smuggle cocaine into the United States. (*Id.* ¶¶ 8, 37). On June 23, 2009, Defendant Williams was found guilty of Importing Cocaine and Selling/Distributing Cocaine, in the Southern District of Florida (Case No. 0:09-cr-60079), and was sentenced on October 23, 2009 to 120 months imprisonment and 8 years supervised release; his projected release date for that term of imprisonment was December 6, 2017. (*Id.*; 2009 PSR ¶¶ 5-8).

However, shortly after he was sentenced in the Southern District, on January 13, 2010, agents from Homeland Security Investigations (HSI) interviewed another inmate at the Miami Federal Detention Center who reported to the agent that Defendant told him that he had traveled to Costa Rica where he met a family and paid the parents to have sex with their underage daughters; Defendant subsequently denied having sex with anyone in Costa Rica. (*Id.* ¶ 9). Defendant also told the other inmate that he had pictures and movies on a computer that included images of child

---

[3] The Court reviewed a copy of the sealed Presentence Investigation Reports (and an Addendum) in this case (dated Oct. 18, 2013) and in *United States v Mark James Williams*, Case No. 0:09-cr-60079 (S.D. Fla. Sept. 8, 2009) ("2009 PSR") provided by the United States Probation Office. Both PSRs will be filed in the docket as sealed entries simultaneously with entry of this Order.

pornography; the computer was still at his mother's house because he did not take it with him on the cruise that led to his March 22, 2009 arrest and conviction for drug trafficking. (*Id.*).

In February 2010, a search warrant was executed at the home belonging to Defendant's mother, and forensic agents located approximately 1,135 images and 50 movies that depicted child pornography on a computer belonging to Defendant; NCMEC confirmed that 245 images are known images of child pornography. (*Id.* ¶ 10). All of the child pornography images that agents located had been putatively "deleted" the day before Williams left on the cruise to Costa Rica that led to his drug trafficking arrest and incarceration. (*Id.*). The images contained visual depictions of a minor who had not attained 12 years of age engaging in sexually explicit conduct. (*Id.*). Two of the images contained sadistic or masochistic conduct. (*Id.*). Specifically, one of the images featured an adult male spanking a nude prepubescent female and the other image showed a nude prepubescent female tied up and blindfolded. (*Id.*).

On May 8, 2013, HSI agents interviewed Williams at the Miami Federal Correctional Facility, and post-*Miranda*, Williams admitted that he was the one who downloaded all of the child pornography on the computer that agents located during the execution of the search warrant. (*Id.* ¶ 11). Williams also admitted that no one else had access to his computer, and that he would masturbate to the child pornography while he smoked "crack" cocaine. (*Id.*).

On May 22, 2013, a federal grand jury in the Middle District of Florida indicted Defendant on one count of possession of child pornography, in violation of 18 U.S.C. §§ 2252(a)(5) and (b)(2), for knowingly possessing material containing visual images of children under 12 years of age engaging in sexually explicit conduct, continuing until March 2009. (Doc. 1).[4] On June 19, 2013, federal authorities arrested Defendant for the child pornography charges. (*Id.* ¶ 12). On August 13, 2013, Defendant pleaded guilty to Count One of the Indictment without a written plea agreement. (Doc. 30). On September 16, 2013, the Court accepted Defendant's guilty plea and adjudicated him guilty. (Doc. 46).

On December 19, 2013, the Court sentenced Petitioner to 120 months in prison, to be served consecutively to the ten-year term he was then-serving on the unrelated drug smuggling charge (Doc. 71 at 9). His offense level was increased by two levels from the base offense level because the material involved a prepubescent minor who had not attained the age of 12 years; it was also increased by four levels because the material portrayed sadistic and masochistic conduct or other depictions of violence. (PSR ¶¶ 19, 20). The offense level was further increased by five levels because Williams' offense involved at least 1,135 images and 50 video files (equivalent to 3,750 images),[5] equating to 4,885 total images. (*Id.* ¶ 21). Some of

---

[4] The case was transferred from the Orlando Division to the Ocala Division of the Middle District of Florida on July 8, 2013 (Doc. 21).

[5] Pursuant to USSG § 2G2.2, comment (n.4(8)(ii), each video file shall be considered to have 75 images, therefore, the Probation Officer calculated the total number of images in the video files to be 3,750. (PSR ¶ 21).

the victims had been identified by the National Center for Missing and Exploited Children, and the Probation Office noted: the "activities portrayed in these computer images undoubtedly inflicted harm to the children who endured the sexual assaults depicted in the images. Furthermore, the conduct of offenders who access materials depicting children in sexually explicit situations serves to enhance the demand for such items, thereby perpetuating the cycle of sexual abuse and victimization." (*Id*. ¶ 13 ("Paragraph 13")).

The Probation Office filed an Addendum which explained that "[D]efendant objects to the inclusion of the language listed in Paragraph 13. His position is that there is no evidence whatsoever that his conduct was either known to or inflicted actual harm on any individual depicted in any image possessed by him." (PSR Add. at 1). The Probation Officer stated: "In response, the probation [office] stands by the information in this paragraph" and included discussion of the harms that possession of child pornography inflicts on victims from the decision in *United States v. Maxwell*, 446 F3.d 1210, 1217 (11th Cir. 2006) and the Child Pornography Prevention Act of 1996.[6] (*Id.* at 1-2).

On November 25, 2014, Defendant's conviction and sentence were affirmed on direct appeal by the Eleventh Circuit Court of Appeals. *United States v. Williams*, 592 F. App'x 828 (11th Cir. 2014); *see also* Docs. 80, 81. Defendant filed a motion to vacate his sentence pursuant to 28 U.S.C. § 2255 in 2016, which was denied along

---

[6] The full section of the PSR Addendum is quoted in the Court's analysis *infra*.

with a request for a certificate of appealability in this Court and at the Eleventh Circuit. *See Williams v. United States*, Case No. 5:16-cv-95-Oc-22PRL (M.D. Fla. 2017) (Docs. 39, 40, 43, 46-49).

On March 7, 2022, Defendant filed his Motion for Compassionate Release (Doc. 104) pursuant to 18 U.S.C. § 3582(c)(1)(A), and the Government responded (Doc. 106) on April 7, 2022. The Court ordered further briefing and the Government filed a Supplemental Response (Doc. 108) on April 14, 2022, the same day that Defendant filed his Reply (Doc. 109) on the issue of exhaustion of remedies.

## II.    ARGUMENTS

Defendant Williams moves for compassionate release to reduce his sentence to time served based on extraordinary and compelling circumstances because (1) he is suffering from stage IV, terminal prostate cancer with a prognosis of less than 18 months to live[7] and (2) because he is more than 65 years old, is experiencing a deterioration in his health due to the aging process, and he contends that he has served more than 10 years of a criminal sentence. (Doc. 104) (citing § 3582(c)(1)(A) and USSG § 1B1.13, cmt. n.1 (A), (B)).

Although the Government acknowledges Defendant's serious medical issues may meet some of the criteria in § 3582, it notes that Defendant "remains able to engage in all activities of daily living." (Doc. 108 at 3). Moreover, the Government opposes compassionate release based on Defendant's long criminal history and

---

[7] *See* Docs. 104-1, 104-2 (excerpted medical records).

issues related to his release plan, arguing that he continues to pose a danger to the community. (*Id.*).

## I.    LEGAL STANDARD

The compassionate release statute, as amended by the First Step Act of 2018, outlines the factors that must be considered before a court may grant compassionate release:

> [T]he court, upon motion of the Director of the Bureau of Prisons, or upon motion of the defendant after the defendant has fully exhausted all administrative rights . . . may reduce the term of imprisonment . . . after considering the factors set forth in section 3553(a) to the extent that they are applicable, if it finds that . . . extraordinary and compelling reasons warrant such a reduction . . . and that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission[.]

18 U.S.C. § 3582(c)(1)(A).

Before the court may modify a defendant's sentence, it must: (1) determine that the defendant has fully exhausted all administrative rights; (2) find that extraordinary and compelling reasons—as defined in the Sentencing Commission's policy statement—warrant the reduction; and (3) consider the § 3553(a) factors. *Id.*; *see United States v. Bryant*, 996 F.3d 1243 (11th Cir. 2021). The defendant "bears the burden of proving entitlement to relief" under § 3582(c)(1)(A). *United States v. Kannell*, 834 F. App'x 566, 567 (11th Cir. 2021) (citation omitted).[8]

---

[8] Unpublished opinions of the Eleventh Circuit constitute persuasive, and not binding, authority. *See* 11th Cir. R. 36-2 and I.O.P. 6.

The Sentencing Commission's policy statement for 18 U.S.C. § 3582(c)(1)(A) is found in U.S.S.G. § 1B1.13. *Bryant*, 996 F.3d at 1248; *see United States v. Giron*, 15 F.4th 1343, 1346 (11th Cir. 2021). To apply U.S.S.G. § 1B1.13, "a court simply considers a defendant's specific circumstances, decides if he is dangerous,[9] and determines if his circumstances meet any of the four reasons that could make him eligible for a reduction." *Bryant*, 996 F.3d at 1254; *see Giron*, 15 F.4th at 1346. If the court determines that the defendant is not dangerous and his circumstances fit into an approved category, then the defendant "is eligible, and the court moves on to consider the [§] 3553(a) factors in evaluating whether a reduction should be granted." *Bryant*, 996 F.3d at 1254.

The commentary to U.S.S.G. § 1B1.13 identifies the four circumstances that could make a defendant eligible for a reduction; in other words, the "four categories of extraordinary and compelling reasons, one of which the defendant must fit to be eligible for relief." *Id.*; *see Giron*, 2021 WL 4771621, at *1–2. In discussing the four circumstances, the commentary states:

(A) Medical Condition of the Defendant.

    (i)    The defendant is suffering from a terminal illness (*i.e.*, a serious and advanced illness with an end of life trajectory). A specific prognosis of life expectancy (i.e., a probability of death within a specific time period) is not required. Examples include metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia.

---

[9] More specifically, the court must determine that the "defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

    (ii)    The defendant is—

        (I)    suffering from a serious physical or medical condition,

        (II)    suffering from a serious functional or cognitive impairment, or

        (III)    experiencing deteriorating physical or mental health because of the aging process, that substantially diminishes the ability of the defendant to provide self-care within the environment of a correctional facility and from which he or she is not expected to recover.

(B) Age of the Defendant. The defendant

    (i) is at least 65 years old;

    (ii) is experiencing a serious deterioration in physical or mental health because of the aging process; and

    (iii) has served at least 10 years or 75 percent of his or her term of imprisonment, whichever is less.

(C) Family Circumstances.

    (i) The death or incapacitation of the caregiver of the defendant's minor child or minor children.

    (ii) The incapacitation of the defendant's spouse or registered partner when the defendant would be the only available caregiver for the spouse or registered partner.

(D) As determined by the Director of the [BOP], there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described in subdivisions (A) through (C).[10]

---

[10] The commentary additionally states: "Pursuant to 28 U.S.C. § 994(t), rehabilitation of the defendant is not, by itself, an extraordinary and compelling reason for purposes of this policy statement." U.S.S.G. § 1B1.13, cmt. n.3.

U.S.S.G. § 1B1.13, cmt. n.1.

If the court finds that the defendant is not dangerous and that extraordinary and compelling reasons[11] exist, the court must consider whether the § 3553(a) factors weigh in favor of release. *See Bryant*, 996 F.3d at 1254. Specifically, the court must consider: "the nature and circumstances of the offense; the history and characteristics of the defendant; the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant." *United States v. Laureti*, 859 F. App'x 490, 491 (11th Cir. 2021) (citing 18 U.S.C. § 3553(a)(1)–(2)).

## II.   ANALYSIS

### A. Exhaustion of Administrative Rights

Defendant contends that he has exhausted administrative remedies because he made a request for compassionate release in October 2021 to the Warden of the Bureau of Prisons ("BOP") facility where he is housed (Doc. 104-2). The Warden agreed that Defendant's terminal condition qualified him for a reduction in his

---

[11] Although Defendant recognizes that *Bryant* is controlling, he contends that the case was "wrongly decided, creating a split of authority between this and other circuits" and the Court has "independent authority to determine what circumstances are extraordinary and compelling." (Doc. 104 at 5 n.8). Defendant cites no applicable authority in support of this point and the Court rejects Defendant's argument. *See United States v. Griffin*, 856 F. App'x 359, 361 (11th Cir. 2021) (citing *Bryant*, 996 F.3d 1243) (finding that the defendant's argument, "anything can be considered as extraordinary and compelling reasons to justify a sentence reduction[,] . . . is foreclosed by [Eleventh Circuit] precedent." (internal quotation marks omitted)).

sentence, and, on October 28, 2021, made a request to the Office of the General Counsel that Defendant's sentence be reduced; more than thirty days had passed since Defendant's request to the Warden. (Doc. 104-3 at 2-6). However, Defendant's request was denied because the United States Probation Office did not approve his proposed release address at that time. (Doc. 104-2 at 5-8).

The Government originally argued that the Director's pending/imminent decision would render Defendant's Motion moot, and his administrative remedies had not yet been exhausted. (Doc. 106). The Government argued that the Court should hold Defendant's Motion in abeyance pending the Director's final decision or deny the Motion. (*Id*.). However, in the Supplemental Response, the Government subsequently agreed that Williams has exhausted all administrative remedies, and the Court does have jurisdiction to consider Defendant's Motion. (Doc. 108 at 2).

The Government also has confirmed that the Probation Officer who would be supervising Defendant in the District of Alaska did not approve the first release plan "in large part due to the hesitancy" of Defendant's brother in having Defendant stay with him. (*Id*. at 4). The current "position of the USPO is that they are able and willing to supervise defendant Williams should the court grant the compassionate relief requested." (*Id.*). Because Defendant has exhausted his administrative rights, the Court may consider Defendant's Motion on the merits. *See* 18 U.S.C. § 3582(c)(1)(A); *see United States v. Harris*, 989 F.3d 908, 910–11 (11th Cir. 2021).

**B. U.S.S.G. § 1B1.13**

In his Motion, Defendant asserts that his terminal metastatic prostate cancer constitutes an extraordinary and compelling circumstance warranting compassionate release under the Guidelines. The medical conditions that qualify as grounds for compassionate release under Subsection A are: (1) a terminal illness or (2) a serious physical or medical condition, serious functional or cognitive impairment, or deteriorating physical or mental health due to the aging process that substantially diminishes the ability for self-care in prison. USSG § 1B1.13, cmt. n.1(A). The Guidelines do not require a "specific prognosis of life expectancy," but provides as examples "metastatic solid-tumor cancer, amyotrophic lateral sclerosis (ALS), end-stage organ disease, and advanced dementia." *Id*.; Doc. 104 at 9-10 (collecting cases finding terminal or stage IV cancer to be an extraordinary and compelling reason).

Alternatively, Defendant argues that he is eligible for a sentence reduction if he: (1) is at least sixty-five years old; (2) "is experiencing a serious deterioration in physical or mental health because of the aging process"; and (3) has served at least ten years or 75 percent of his term of imprisonment, whichever is less. U.S.S.G. § 1B1.13, cmt. n.1(B). He contends that he is experiencing a serious deterioration in his physical health "because of the aging process" related to development of terminal cancer since "age is the most common risk factor for prostate cancer." (Doc. 104 at 11 (citing medical resources)). He argues that he was diagnosed with cancer approximately two years ago and the fact that this condition has worsened since his

original incarceration as he has aged "suggests that the condition is due to the aging process." (*Id.*).

The Court finds that Defendant's serious medical condition would qualify under Subsection A (only) of the Guidelines. The excerpted medical records attached to Defendant's Motion reflect Defendant has a terminal diagnosis of stage IV metastatic Prostate Cancer, diagnosed in January 2020, and a life expectancy of less than 18 months to live; his pain level is currently severe; and he is unable to sleep at night. (Docs. 104-1, 104-2). However, the Court finds that Defendant would not qualify for release under Subsection (B) because, although he is more than 65 years old, he has not served ten years of his term of imprisonment on the child pornography conviction in the Middle District of Florida and the sentence on imposed by this Court. Rather, as explained above, he has served only approximately 36 months of the 120-month sentence for child pornography.

In both the Government's initial and Supplemental Responses based on review of the medical records and discussion with BOP staff, the Government acknowledges that Defendant's condition is terminal. (Docs. 106 at 1-2; 108). Although the Government argues that Defendant should not be released based on his long criminal history, dangerousness, and issues related to his release plan, the Government acknowledges that Defendant suffers from a terminal medical condition and meets some of the criteria outlined in §3582. (Doc. 108).

For purposes of this Motion, the Court finds that Defendant's terminal medical condition would qualify as an "extraordinary and compelling" reason for release under Subsection (A). However, although a defendant can establish that extraordinary and compelling reasons exist, he is ineligible for release under 18 U.S.C. § 3582(c)(1)(A) if he is a danger to the community. The Court addresses the issue of whether Defendant is a danger to the community, and the other issues raised by the Government's opposition, below.

## C. Danger to the Community

The Court must deny a defendant's release under the Guidelines unless it determines that he "is not a danger to the safety of any other person or to the community." USSG §1B1.13(2). The defendant bears the burden of establishing that he no longer represents a danger to any other person or the community. *See United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013); *United States v. Heromin*, No. 8:11-cr-550-T-33SPF, 2019 WL 2411311, at *2 (M.D. Fla. June 7, 2019). "Dangerous" in this context requires a comprehensive view of community safety–"a broader construction than the mere danger of physical violence." *United States v. Cook*, 880 F.2d 1158, 1161 (10th Cir. 1989).

Defendant contends that he is not a danger to any person or to the community. (Doc. 104). He points to the Warden's recommendation for compassionate release which, he argues, considered whether he would pose a danger to the safety of others and that he is a low security level inmate who has had few disciplinary incidents in

his nearly thirteen years of incarceration. (Docs. 104 at 13; 104-3; 104-4 at 2). He argues that his most recent disciplinary incident was the result of an "attempt to control his growing pain caused by his advanced cancer." (Doc. 104-1 at 5 (Physician's Assistant stating: "patient appears to have had an issue with diverting pain meds for personal use . . . Given patient's disease state however, I do believe pain is justified.")); Doc. 104-4 at 2 ("misusing authorized medication").

The Government argues that Defendant is a danger to the community, pointing to Defendant's scheme in smuggling cocaine from Costa Rica; his conversations with another inmate about the child pornography on his computer (at his mother's home) after his previous child pornography conviction; his paying to have sex with minors in Costa Rica; and his failure to register as a sex offender during the time that he possessed child pornography. The Government also raises concerns about Defendant's "troubling" conduct while on probation in that, after his first conviction for possessing child pornography in federal court in the District of Alaska, Defendant attended sex-offender treatment but "reached an impasse during the treatment because of 'Williams' resistance to internalize his risk factors." (*See* 2009 PSR ¶ 41). Defendant "blamed his behavior, whether victimizing children or engaging in other criminal behavior, solely on his use of crack cocaine" and, as a result, the treatment provider concluded that Williams "remained at 'a high risk to reoffend,' and informed him that a re-offense for him might be '1) an easy money scheme, 2) drug usage, 3) solicitation of prostitutes, 4) an opportunistic sexual

offense on a minor female.'" (*Id.*). Treatment ceased when Defendant remained "resistant to identifying behaviors that would predispose him to engage in sexually abusive behavior. He did not view his viewing child pornography as having victimized anyone [and] detached himself from the label of 'criminal' or 'sex offender' by blaming his use of crack cocaine." (*Id.*). Based on these reasons, including Defendant's criminal history and his "high risk" to commit future crimes, the Government argues that Defendant continues to pose a threat to the community if released. (Doc. 108).

The Court must deny Defendant's release under the facts of this case and the applicable Guidelines because the Court fails to find Defendant "is not a danger to the safety of any other person or to the community." USSG §1B1.13(2). Prior to Defendant's December 19, 2013 sentencing in this Court, although represented by counsel, Defendant submitted a *pro se* "Statement from Defendant for Sentencing" to the Court.(Doc. 57). In that Sentencing Statement, Defendant "acknowledge[d] that the downloading and viewing of child pornography causes grave concern to the community at large" and "apologize[d] to the victims of child pornography who no doubt have suffered greatly and continue to experience mental and emotional anguish knowing that such pictures of themselves exist." (*Id.* at 1). Defendant argued in "mitigation" of his sentence—and in requesting a concurrent sentence—that in 2008 he had a relapse after five years and started viewing child pornography again, but that he "had a crisis of conscience" and stopped viewing and "destroyed on [his]

own volition all illegal pictures." (*Id.* at 2). He argued that there was "no evidence of purchasing, promoting or distributing" or "trading picture with other offenders" any of the child pornography at issue; and "no evidence of attempts at online chats or communication of any kind with minors." (*Id.*). He further argued that there were no "aggravating factors present in [his] case" because he had destroyed the child pornography photographs and he had "no history of sexually exploitive conduct." (*Id.*). He denied discussing with another inmate the child pornography on his computer at his mother's house or that he had ever had sexual contact with anyone on his trips to Costa Rica. (*Id.* at 3). He further admitted to having "a checkered past for relatively minor drug offenses" but argued that he had been "gainfully employed for 48 years" and was honorably discharged from the military. (*Id.* at 4).[12]

There was a colloquy at sentencing about the victim impact on children that possession of child pornography causes, and Defendant's lack of acknowledgement or recognition of the impact on victims did influence the Court's decision to impose the consecutive sentence. (Doc. 71). When the Court inquired at Defendant's sentencing whether he had any objection to the PSR, his counsel stated an objection to "the inclusion of a policy statement in the presentence report regarding children" in Paragraph 13, which Defendant argued should be "deleted from the Presentence Report." (*Id.* at 3). The pertinent portion of Paragraph 13 read:

---

[12] Defendant's Sentencing Statement also complained about the advice received from his attorneys and their decision not to challenge the search warrant. (Doc. 57 at 5).

As the Court stated in *U.S. v Maxwell*, 446 F3.d 1210, 1217 (11th Cir. 2006), "Congress indicated how intrastate possession of child pornography affects the larger market: [T]he existence of and traffic in child pornographic images . . . inflames the desires of child molesters, pedophiles, and child pornographers who prey on children, thereby increasing the creation and distribution of child pornography and the sexual abuse and exploitation of actual children who are victimized as a result of the existence and use of these materials; the sexualization and eroticization of minors through any form of child pornographic images . . . encourag[es] a societal perception of children as sexual objects and lead[s] to further sexual abuse and exploitation of them; and . . . prohibiting the possession and viewing of child pornography will encourage the possessors of such material to rid themselves of or destroy the material, thereby helping to protect the victims of child pornography and to eliminate the market for the sexual exploitative use of children . . . ." Further, Congress has long recognized the harm child pornography inflicts on its victims. In passing the Child Pornography Prevention Act of 1996, Congress specifically found that "[t]he use of children as subjects of pornographic materials is harmful to the physiological, emotional and mental health of the child." S. Rep. 104-358 (citing *New York v. Ferber*, 458 U.S. 747 (1982)). More recently, The Adam Walsh Child Protection and Safety Act of 2006 made specific findings regarding psychological harm and trauma suffered by victims of child pornography. First, Congress found that illegal production, transportation, distribution, receipt, advertising and possession of child pornography, is harmful to the physiological, emotional, and mental health of the children depicted in child pornography and has a substantial and detrimental effect on society as a whole. Congress also found that technological advances have had the unfortunate result of greatly increasing the interstate market in child pornography. Finally, Congress found that every instance of viewing child pornography represents a renewed violation of the privacy of the victims and a repetition of their abuse.

(PSR ¶ 13). At the sentencing, when Defendant raised the objection to inclusion of

Paragraph 13, the Court clarified: "The fact that child pornography harms children?"

and defense counsel responded:

Judge, I understand that it does, and I'm not here to say that it doesn't, but for purposes of the permanent record of Mr. Williams, which this would become,

given the fact that there was no direct contact between Mr. Williams and children, we would ask that it be removed.

(*Id.*). The Government argued at sentencing that the inclusion of the policy statement in Paragraph 13 was appropriate, and the Court overruled Defendant's objection. (*Id.* at 4). Defendant's counsel argued in mitigation of his sentence:

> As the Court's aware Mr. Williams is currently serving a 10 year sentence for [an] unrelated case involving drug trafficking. The conduct . . . of this case predates the case for which he's presently serving the sentence, and as . . . reflected in the presentence report, when the images were found on Mr. Williams' computer, they had all been deleted and I think the Court should consider the fact that he had in fact deleted these images from his computer. We don't know at what point in time they were actually downloaded to the computer or how long they had been there. However, we are aware we know they have in fact been deleted. Mr. Williams has indicated, as is reflected in the report, that at the time of his commission of this offense he was involved in smoking of crack cocaine. He had a number of financial woes involving the loss of his mother's investment money. He has cooperated. He entered a guilty plea. He confessed to the agent. And we would respectfully ask the Court to consider exercising its discretion under 5G1.3 of the sentencing guidelines to sentence him concurrently with this existing sentence. Mr. Williams is 67 years old at this point in time and he still has probably five years left on his existing sentence which would make him 71 or 72 upon his release. He is already a sex offender. So that registration requirement has already been imposed upon him. And we believe that an additional 10 year sentence beyond his existing sentence would almost be tantamount to a life sentence in prison. We respectfully ask the Court on mitigating factors presented in his letter and presented here and as it exists in the presentence report consider him to be sentenced concurrently with his existing sentence.

(*Id.* at 5-6). However, the Government opposed the request for a concurrent sentence and argued for a consecutive sentence of ten years in addition to the drug sentence the defendant was serving at the time because:

[T]his is not the defendant's first conviction for this kind of offense in federal court. As the Court knows from the PSR this defendant was convicted of pretty much the same conduct about 10 years ago in Alaska federal court. Now, in addition, this defendant is not only serving a sentence currently for the drug trafficking offense, he's also serving a concurrent sentence for failure to register as a sex offender. So when the defense counsel talks about he already has that sex offender registration requirement, well, I think the Court should know he didn't comply with that requirement. He's been sentenced again in federal court for failing to comply with that and that sentence was concurrent.

I think it's also interesting to note that in the letter that the Court received . . . that the defendant recently submitted[13] he makes [] an argument that he deleted these images. I think it's left in that letter for the Court to believe that somehow he had abandoned this conduct. Well, I think it's important for the Court to know in the PSR the deletion of those pictures happened the day before he left for his trip on Costa Rica. This wasn't a person who was deciding that I'm not going do this any more. This is a person who was destroying the evidence before he left the country so as not to leave around so people could find and convict him again of this kind of offense, someone who also at the time as shown through his conviction was not registered as a sex offender. So for those reasons, Your Honor, the United States is requesting a consecutive sentence of 10 years.

(*Id.* at 7-8). Defendant Williams made the following statement during the sentencing hearing regarding his failure to register as a sex offender:

I moved from Alaska when I finished that term in Alaska in . . . 2003. I did my probation and then I was released from probation six months early. And my father took ill. My parents lived in Tavares [Florida] and it fell on me to move down here to take care of my mother and my father. And the problem – I'm just telling you what I was faced with – is that they live in a small retirement community and when you -- I had every intention of registering but the problem is I went to the local library and I found out that they published a bulletin and identified all the sex offenders.

---

[13] (Doc. 57). The *pro se* Sentencing Statement from Williams was apparently provided to counsel shortly before the sentencing hearing based on counsel's comments at the hearing. (Doc. 71).

> The lady who lived next door to my mother was a local librarian. You know, it was a darn if you do, darn if you don't. If I would have registered in Florida it would have ruined my parent's reputation in their community. And I just -- I had to stay there and take care of her because my dad died and I just couldn't register and have the word get out about that and ruin her reputation and that's why I didn't register. Wasn't that I didn't want to but it would have just ruined her life. And that's why I stuck with it having to make a tough decision.

(*Id*. at 8-9). Following Defendant's statement and based on the parties' statements, the PSI, and the advisory guidelines, the Court pronounced a sentence for Williams to served 120 months *consecutive* to the term of imprisonment imposed in the Southern District of Florida case, with 10 years of supervised release, and required participation in a mental health program specializing in sexual offender treatment; submission to polygraph testing for treatment and monitoring purposes; and registration as a sex offender.[14]

The Eleventh Circuit affirmed this Court's imposition of the consecutive 120-month sentence based on the following reasoning:

> In this case, the district court expressly said that it had considered the § 3553(a) sentencing factors in deciding to impose [on Williams] his 120-month sentence consecutive to his undischarged 120-month sentence. As the record reveals, the court discussed Williams's criminal history, specifically his prior conviction for the same type of child-pornography-possession offense. The court also noted that Williams's undischarged sentence for his drug conviction was not related to the instant offense and already was being served concurrent to his failure-to-register conviction. In light of Williams's history and characteristics, the court determined that a consecutive sentence was important to achieve the statutory purposes of sentencing. Additionally, the court

---

[14] *United States v Mark James Williams*, Case No. 0:09-cr-60079 (S.D. Fla. 2009).

explained that the consecutive sentence it imposed was "sufficient but not greater than necessary" to achieve these purposes.

Moreover, because the instant sentence and the undischarged sentence were imposed at different times, nearly four years apart, the sentences must run consecutively unless the court orders otherwise, which the court did not do here. *See* 18 U.S.C. § 3584(a). Indeed, both § 5G1.3 and § 3584 show a preference for sentences imposed at different times to run consecutively. *Ballard*, 6 F.3d at 1506. Further, contrary to Williams's argument, the court did not need to consider the Sentencing Commission's proposed factors for consideration when sentencing under§ 2G2.2, since§ 2G2.2 was never amended to include those factors. We also find no merit to Williams's claim that the district court did not address his concerns at sentencing. Under Rule 32, the district court "must – for any disputed portion of the presentence report or other controverted matter – rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing." Fed.R.Crim.P. 32(i)(3)(B). A defendant triggers Rule 32(i)(3)(B) only by challenging statements of fact that are in the PSI: *See United States v. Owen*, 858 F.2d 1514, 1517 (11th Cir. 1988) (discussing Rule 32(c)(3)(D), the predecessor to Rule 32(i)(3)(B)). Further, before imposing a sentence, the district court must address the defendant and allow him to speak in mitigation of his sentence. Fed.R.Crim.P. 32(i)(4)(A)(ii).

Williams has not shown any plain error—the appropriate standard of review since Williams failed to challenge these issues at sentencing, even when provided the opportunity to speak—concerning the court's failure to question him regarding his objection to the PSI and his counsel's alleged ineffective assistance. Indeed, as the record shows, Williams's objection to the language in the PSI concerning the confidential informant, as raised in his sentencing statement, already had been raised by his attorney and resolved when the probation officer modified the challenged language and included a statement that Williams denied engaging in any sexual misconduct in Costa Rica. Moreover, Williams cites nothing to suggest that the district court was obligated to question him about his dissatisfaction with his trial counsel, particularly when Williams did not request substitute counsel in his sentencing statement. The court complied with Rule 32's mandate to allow Williams to speak at sentencing, and when given this

opportunity, Williams did not express any dissatisfaction with his attorneys.

But even if the district court's failure to question Williams on these two issues constitutes plain error, Williams did not show that such error affected his substantial rights. The record does not indicate that the district court considered the allegation of sexual misconduct in Costa Rica in determining Williams's sentence. *Rather, the court relied on his prior convictions for possessing child pornography, importing and distributing cocaine, and failing to register as a sex off ender to support its sentencing decision.*

(Doc. 80 at 3-6) (emphasis added).

The Court finds that Defendant presents a danger to others, specifically children. "[F]ederal courts have been disinclined to grant compassionate release to petitioners convicted of crimes involving child pornography, even for vulnerable petitioners during the COVID-19 pandemic, citing potential dangerousness." *Coleman v. United States*, 465 F. Supp. 3d 543, 549–50 (E.D. Va. 2020) (denying compassionate release because the release plan failed to adequately protect the public from the potential of a subsequent offense involving child pornography where offender committed offense in presence of family members (while sleeping), he exploited and alienated them, casting doubt on suitability of placement with 88-year old mother, and there was no evidence he had participated in rehabilitative programming specific to his conviction) (citing *United States v. Mitchell*, 2020 WL 2770070, at *4 (E.D. Cal. May 28, 2020) (denying compassionate release because of the petitioner's lack of rehabilitation and the absence of a detailed plan to prevent reoffending); *United States v. Feiling*, 453 F.Supp.3d 832, 841–42 (E.D. Va. Apr.

10, 2020) (denying motion for compassionate release in part because the petitioner committed his offense while at home and wanted to return home to finish his sentence); *United States v. Meizin*, 456 F.Supp.3d 911, 916–17 (N.D. Ohio Apr. 27, 2020) (denying a motion for compassionate release because of the easy access to electronic devices that would allow the petitioner to reoffend); *United States v. Hylander*, 2020 WL 1915950, at *3 (S.D. Fla. Apr. 20, 2020) (denying a motion for compassionate release because the petitioner wanted to return to the location of his offense upon release)); *United States v. Smith*, No. 14-20814, 2020 WL 5071176, at *3 (E.D. Mich. Aug. 26, 2020) (denying release where defendant was a danger to the community, especially since he had not completed a rehabilitative sex offender program and the ease of access to electronic devices and his ability to hide his conduct from his wife for over 15 years would make it easy for him to reoffend).

The Court cannot overlook Defendant's recidivism in possession of child pornography, his failure to register as a sex offender, and his inability to accept responsibility for his crimes and lack of remorse or conscious acknowledgement of the impact to the victims in the thousands of images of child pornography that he had in his possession—on at least two separate occasions—even *after* imprisonment for the first conviction.

The Court also rejected at sentencing Defendant's representation that he had "deleted" the images "of his own volition" before he left for the cruise to Costa Rica in sentencing Defendant to a consecutive sentence. District courts have denied

compassionate release to child pornography defendants, finding that these defendants would be a danger to the community where they had engaged in "acts to evade detection" by creating and deleting accounts to "shield" the activities "from any law enforcement investigation." *See, e.g., Miezin*, 456 F. Supp. 3d at 916.

The Court also finds that the proposed release plan, for Defendant to live with his brother, is problematic. Defendant's brother was initially hesitant and did not want to be part of the release plan. The Probation Office noted in the October 2013 PSR that "the defendant advised that he does not have frequent contact with his brother" and he "could not provide a contact number for his brother." (PSR ¶¶ 46, 48). Defendant's brother previously obtained a domestic violence protective order against Defendant in Anchorage, Alaska, which Defendant violated on March 14, 2003 by going to his brother's workplace. (PSR ¶ 41). Although the charge was dismissed, the incident and the necessity of the protective order convey the problematic nature of the siblings' relationship and the understandable initial misgivings of Defendant's brother to be involved in Defendant's release plan. Defendant has since stated in an email to the Butner Medical Center social worker that they "ha[d] some problems in the past but that was 15 years ago and [they] have put those aside and are close friends once again." (Doc. 104-2 at 6).

Even if, as the Probation Officer found on the re-interview of Defendant's brother, he is willing to have Defendant live with him at this point, the Court has concerns regarding the danger to the community due to Defendant's previous

recidivism and the ease of access to the internet. As another district court explained

in rejecting a release plan for a defendant convicted of child pornography charges:

> [The defendant's] requested relief herein – home confinement – would
> not lessen his danger to the community. Quite the opposite, it would
> only serve to enhance his danger. [His] crime does not require anything
> more than access to the internet. In today's society with smartphones,
> tablets, laptops, smart TVs, and countless other devices, it would not be
> possible to place [him] in home confinement and eliminate his ability
> to engage in his prior criminal conduct. Further, the pandemic and the
> CDC's recommended guidelines would only serve to make it more
> difficult to monitor [his] behavior in home confinement.

*Id.* For the reasons explained above, the Court finds that Defendant is a "danger to

the safety of other persons or to the community," principally the children who are

the victims of child pornography, and a sentencing reduction would not be

"consistent with applicable policy statements issued by the Sentencing

Commission." 18 U.S.C. § 3582(c)(1)(A); USSG §1B1.13(2). Therefore, the Court

must deny Defendant's release under the Guidelines.

### D. 18 U.S.C. § 3553(a) Factors

For the sake of completeness, the Court addresses the final consideration, the

§ 3553(a) factors. Defendant argues that a sentence of time served in this case, where

Defendant is terminally ill, is sufficient but not greater than necessary to comply

with the purposes of sentencing. He argues that his terminal diagnosis has been

deemed by the Commission to be "a compelling reason to reduce [a] sentence,"

especially in consideration with the time he has already served. Defendant also

argues that he "will be subject to a lengthy term of supervision under the watchful

eye of the United States Probation Office" and, if not granted compassionate release, he is certain to die of cancer in prison with compounded health issues and pain—in effect, a "medical purgatory." (Doc. 104). The Government argues that the § 3553(a) factors make Defendant ineligible for compassionate release based on his long criminal history and the danger he poses to the community.

The Court also considers the following § 3553(a) factors, as applicable, as part of its analysis:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner; (3) the kinds of sentences available; (4) the kinds of sentence and the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a); § 3582(c)(1)(A); *United States v. Chambliss*, 948 F.3d 691, 694 (5th Cir. 2020).

Although Defendant's terminal cancer diagnosis presents an extraordinary and compelling reason for relief, the applicable § 3553(a) factors also do not weigh in favor of compassionate release in his case. In addition to the reasons set forth in the previous section regarding danger to the community, the Court very intentionally

imposed a sentence that was consecutive—rather than concurrent—for Defendant's *second* conviction for child pornography, because he did not accept responsibility for his crimes, did not show remorse or acknowledge the impact on the victims, and he failed to register as a sex offender. He "reached an impasse" in sex-offender treatment after the treatment provider concluded that he "remained at high risk to re-offend" in drug usage or "an opportunistic sexual offense on a minor female" among other crimes.

Imposition of the consecutive sentence was affirmed on appeal by the Eleventh Circuit. (Doc. 80 at 2-3). Moreover, Defendant has only served approximately 36 months of the consecutive 120-month sentence imposed for his recidivist possession of child pornography. *See United States v. Smith*, No. 14-20814, 2020 WL 5071176, at *4 (E.D. Mich. Aug. 26, 2020) (denying release of child pornography defendant based on the nature of his crime, who had more than half of his sentence remaining and before he completed a sex offender treatment program because it would not reflect the seriousness of the offense, promote respect for the law, provide just punishment, afford adequate deterrence, or protect the public, as required under 18 U.S.C. § 3553(a)).

Because of Defendant's recidivism, the Court finds Defendant's arguments regarding his rehabilitation or lack of disciplinary issues (Doc. 104 at 12-13) to be unpersuasive. Considering the nature of Defendant's crimes and the large number of child pornographic images, including of children under 12 years old in this case,

Defendant's sentence reflects the seriousness of his offenses, deters criminal conduct, protects the public, and serves as a just punishment.

## I.    CONCLUSION

Upon diligent review and consideration, the Court finds that although Defendant's medical condition rises to the level of extraordinary and compelling, compassionate release is not warranted because he would pose a danger to the community if released. A "court is not required to reduce a sentence on compassionate release grounds, even if a prisoner qualifies for such reduction because of his medical condition. . . . [Section 3582] was drafted using the word may, not must." *United States v. Rodriguez-Orejuela*, 457 F. Supp. 3d 1275, 1285 (S.D. Fla. 2020) (internal quotation marks and citation omitted).

Based on the foregoing, it is ordered as follows:

1.    Defendant's Motion for Compassionate Release (Doc. 104) is **DENIED**.

2.    The Clerk is directed to file under seal the 2013 Presentence Investigation Report in this case and the 2009 Presentence Investigation Report in *United States v Mark James Williams*, Case No. 0:09-cr-60079 (S.D. Fla. 2009).

**DONE** and **ORDERED** in Chambers, Orlando, Florida on May 5, 2022.

ANNE C. CONWAY
United States District Judge

Copies furnished to:

Counsel of Record
Magistrate Judge
United States Marshals Service
United States Probation Office
United States Pretrial Services